[Cite as *State v. Berhane*, 2011-Ohio-2390.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 95089**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## SOLOMON BERHANE

DEFENDANT-APPELLANT

**JUDGMENT:**
**AFFIRMED**

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-527719

**BEFORE:** Sweeney, J., Stewart, P.J., and Keough, J.

**RELEASED AND JOURNALIZED:** May 19, 2011

**ATTORNEYS FOR APPELLANT**

Ronald L. Frey, Esq.
Ian M. Friedman, Esq.
Ian Friedman & Associates, L.L.C.
1304 West Sixth Street
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor
By: Katherine Mullin, Esq.
    Marc D. Bullard, Esq.
Assistant Prosecuting Attorneys
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

JAMES J. SWEENEY, J.:

{¶ 1} Defendant-appellant Solomon Berhane ("defendant") appeals his convictions for aggravated robbery, kidnapping, disrupting public service, and vandalism, with firearm specifications. After reviewing the facts of the case and pertinent law, we affirm.

{¶ 2} On April 17, 2009, four masked gunmen robbed 12 men who were playing a private high-stakes poker game in Solon, Ohio. The gunmen took cash, jewelry, and other personal property.

{¶ 3} On August 31, 2009, seven individuals were indicted for 12 counts of aggravated robbery, 12 counts of kidnapping, one count of disrupting public services, and one

count of vandalism, all with firearm specifications. The co-defendants include the following: the four masked gunmen — Dominic Berlingeri, Randall Barnes, Jose Arzola-Torres, and Andres Arzola; William Masters, who orchestrated the robbery; Wayne Bunkin, who knew about the poker game and informed Masters of the details; and defendant, who allegedly acted as a lookout.

{¶ 4} On March 12, 2010, defendant's case proceeded to a bench trial. The remaining six co-defendants entered guilty pleas. On March 30, 2010, the court found defendant guilty of all counts.[1] The court sentenced defendant to an aggregate term of six years in prison.

{¶ 5} Defendant appeals and raises two assignments of error for our review.

{¶ 6} "I. The State of Ohio failed to introduce sufficient evidence to sustain a conviction in violation of appellant's right to due process of law as guaranteed by Article I, Section 10 of the Ohio State Constitution and the Fourteenth Amendment to the United States Constitution."

{¶ 7} "II. Appellant's convictions were against the manifest weight of the evidence and, therefore, his convictions were in violation of the Ohio State Constitution and the Sixth and Fourteenth Amendments to the United States Constitution."

---

[1]The court granted defendant's Crim.R. 29 motion for acquittal as to the furthermore clause in count 26, finding that the state failed to prove the value of the property vandalized was between $5,000 and $100,000.

{¶ 8} When reviewing sufficiency of the evidence, an appellate court must determine, "after reviewing the evidence in a light most favorable to the prosecution, whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492.

{¶ 9} The proper test for an appellate court reviewing a manifest weight of the evidence claim is as follows:

{¶ 10} "The appellate court sits as the 'thirteenth juror' and, reviewing the entire record, weighs all the reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541.

{¶ 11} Defendant was convicted of the following offenses:

{¶ 12} Aggravated robbery in violation of R.C. 2911.01(A)(1), which states that "[n]o person, in attempting or committing a theft offense * * * shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it * * *";

{¶ 13} Kidnapping in violation of R.C. 2905.01(A)(2), which states that "[n]o person, by force, threat, or deception * * * shall remove another from the place where the other person

is found or restrain the liberty of the other person * * * [t]o facilitate the commission of any felony or flight thereafter * * *";

{¶ 14} Disrupting public services in violation of R.C. 2909.04(A)(1), which states that "[n]o person, purposely by any means or knowingly by damaging or tampering with any property, shall * * * [i]nterrupt or impair * * * telephone * * * service * * *";

{¶ 15} And vandalism in violation of R.C. 2909.05(B)(1)(a), which states that "[n]o person shall knowingly cause physical harm to property that is owned or possessed by another, when * * * [t]he property is used by its owner or possessor in the owner's or possessor's profession, business, trade, or occupation, and the value of the property or the amount of physical harm involved is five hundred dollars or more * * *."

{¶ 16} Additionally, defendant was convicted of one- and three-year firearm specifications in violation of R.C. 2941.141(A) and 2941.145(A), which apply when an offender had and brandished a firearm while committing an offense.

{¶ 17} Defendant's convictions were based on accomplice liability, which is governed by R.C. 2923.03, the pertinent parts of which state as follows:

{¶ 18} "(A) No person, acting with the kind of culpability required for the commission of an offense, shall * * * (2) Aid or abet another in committing the offense * * *.  (F) Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender."

{¶ 19} In weighing the testimony of a co-defendant in a case based on accomplice liability, the court should take into consideration R.C. 2923.03(D), which states that "the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion * * *."

{¶ 20} In the instant case, eleven of the 12 victims testified that on April 17, 2009, they were playing poker at a commercial building in Solon owned by one of the players. At approximately 11:30 p.m., one of the men went outside to smoke a cigarette. Four armed and masked men held the player at gunpoint and demanded to be taken into the game. Once inside, the gunmen yelled at the players to put the contents of their pockets on the poker table and forced them at gunpoint to get on the ground.

{¶ 21} The gunmen took cash, credit cards, wallets, jewelry, car keys, and cell phones from the players. The offenders ripped the phones from the office walls and smashed the computer equipment. The incident took five to ten minutes, and, as the gunmen were leaving, one said, "Don't come after us, there is a bomb by the door." One of the players managed to keep his cell phone and called 911. At 11:51 p.m., Solon police received a dispatch of a robbery in progress and went to the scene.

{¶ 22} According to the victims, between $52,000 and $68,000 in cash and over $20,000 worth of jewelry was stolen. The victims' car keys were found scattered outside in the parking lot and some of the victims' cell phones were found in the toilet.

{¶ 23} Defendant does not challenge that this evidence establishes that the co-defendants committed the crimes. Rather, he argues that he did not aid or abet the co-defendants in committing the offenses. In relation to whether defendant was involved in this robbery, two co-defendants, Masters and Barnes, testified at trial:

{¶ 24} Masters testified that he pled guilty to the indictment as charged, and he agreed to testify against defendant to possibly mitigate his prison sentence. Masters knew Barnes, Bunkin, and defendant because they regularly played poker together. Defendant was also hired to deal cards in the games at times. Bunkin had previously played at a high-stakes game in Solon and approached Masters with the idea of robbing it. Masters recruited Berlingeri, who in turn recruited Arzola-Torres and Arzola (collectively, "the Arzola brothers") and an unidentified male to act as a driver ("the unidentified driver"). Masters also recruited Barnes. Masters could not remember if he or Barnes recruited defendant.

{¶ 25} Masters testified that they were not sure if everyone could fit in one car, "[s]o we spoke about if [defendant] wanted to go out there, he could be one of the guys on the lookout and just help drive them and that would be kind of his role in what was going on, and that we would give him some money for it." According to Masters, this conversation took place in his apartment prior to the robbery, and defendant agreed to participate.

{¶ 26} On the day of the robbery, Masters sent a text message to defendant's cell phone that stated "got cash for U." Masters testified that this meant the robbery was going

forward.   Masters, Barnes, and defendant drove to Solon to scope out the location and choose the best escape route.   Defendant suggested a "cut-through * * * to get back to 271," which was an alternate route to avoid the heavily traveled Miles Road and interstate 480.

{¶ 27} On the night of the robbery, the Arzola brothers, Berlingeri, the unidentified driver, Barnes, defendant, and Masters met at Masters' apartment in Tremont.   Bunkin had no participation on the night of the robbery because he knew some of the players.   Before they left Masters' apartment, one of the Arzola brothers loaded a shotgun in the kitchen. Defendant was in the kitchen at the time and would have been able to see this.

{¶ 28} The plan was to meet at the Crazy Horse strip club, which is approximately one mile from the location of the poker game.   Masters left his apartment with Barnes and stopped at WalMart to buy latex gloves.   The Arzola brothers rode with the unidentified driver and Berlingeri rode with defendant. The Crazy Horse parking lot was full and, via cell phones, the group arranged to meet at a gas station across the street.   When Masters arrived at the gas station, defendant was already there in his SUV with Berlingeri.   Barnes got out of Masters' car and "jumped in" defendant's SUV.   After this, Masters left the scene and went home.

{¶ 29} According to Masters, the plan was for the Arzola brothers, Berlingeri, and Barnes to get into the poker game.   The unidentified driver was to operate the get away car, and defendant was to act as a lookout and call the others if he saw or heard the police.   After

Masters left, he called defendant, who reported that the Arzola brothers, Berlingeri, and Barnes got into the unidentified driver's car, and defendant was "down the street * * * looking out."

{¶ 30} Barnes, Berlingeri, the Arzola brothers, the unidentified driver, and defendant returned to Masters' place after the robbery. Masters was already there and the men began to count the money. Bunkin was to get 50 percent of what was taken for providing the tip. Defendant and the unidentified driver were to get $500 apiece, and the rest would be split between the remaining co-defendants. Masters testified that there was "around $13,000, $14,000." However, asked if he remembered there being $23,000, Masters replied, "Maybe." Defendant was there when the money was divided, and Masters and Barnes gave defendant "his cut." Everyone left after the money was distributed.

{¶ 31} Barnes testified that he gave a written statement to the police on March 5, 2010 and pled guilty to reduced charges. At the time of Barnes' testimony, he had not been sentenced. Barnes stated that he, Masters, Berlingeri, the Arzola brothers, defendant, and the unidentified driver met at Masters' apartment on the night of April 17, 2009. According to Barnes, this is when he first learned of the plan to rob a high-stakes poker game in Solon. Barnes denied driving with Masters and defendant to Solon prior to the robbery.

{¶ 32} Masters drew a diagram of the location, came up with the plan, and told everyone what to do. Barnes' role was to go inside, wait until the players were forced to the ground, and get the cash from the poker chip box. Defendant's role was "just to be a

lookout." Barnes rode with Masters and picked up blue surgical gloves on the way to the designated meeting spot. When they arrived at the gas station, defendant was there in his SUV. Barnes got out of Masters' car and got into the unidentified driver's car. Berlingeri and the Arzola brothers were already in this vehicle. Defendant drove off in his SUV alone to act as lookout.

{¶ 33} The unidentified driver took Barnes, the Arzola brothers, and Belingeri to the poker game and waited in the car. The four men had masks and gloves on. Three of the men carried guns, but Barnes denied being armed. After waiting for ten to 20 minutes, a player came outside to smoke a cigarette, and one of the Arzola brothers grabbed him. Barnes was the last one to enter the building. He made sure the players were on the ground before taking the cash out of the poker chip box. Barnes went to the car and waited for Berlingeri and the Arzola brothers. When they left Solon, they drove north on interstate 271.

{¶ 34} Everyone, including defendant, met at Masters' house after the robbery. Barnes and Masters counted the money from the box, which, according to Barnes, totaled $23,000. Barnes received $3,000 or $3,500 and defendant received $500, although Barnes did not witness this; rather, he learned it from Masters and defendant separately.

{¶ 35} Solon Police Detective Ross Faranda testified that he arrived at the scene shortly after the robbery took place. He spoke with all 12 victims that night, who gave vague

but similar descriptions of the four suspects: "Masked individuals, Hispanic accents, possible automatic weapon, pistol, shotgun, no vehicle seen, unknown escape route."

{¶ 36} The first lead in the investigation came when a sergeant from the Orange Village Police Department recovered the contents of one of the player's wallets, which was found in a driveway approximately one mile from the robbery location. This evidence was eventually turned over to Det. Faranda, who determined that the suspects most likely fled north on interstate 271 after the robbery. Later in the investigation, property from another player's wallet was found on the "northbound I-271 berm between Cedar and Chagrin, which [is] consistent with the escape route taken after the robbery."

{¶ 37} The next break in the investigation came on April 23, 2009, six days after the robbery, when Berlingeri's car broke down in Sheffield. The police stopped to assist him and, after determining that his driver's license was suspended, placed him under arrest. One of the Arzola brothers was in Berlingeri's car at the time, and he began throwing items on the ground, which the police thought was suspicious. Property belonging to four of the players, including identification, credit cards, two wallets, a watch, and a key chain, was found in and underneath the car. The police later learned that Berlingeri purchased the 1999 Buick Century with $2,200 cash on April 18, 2009.

{¶ 38} The Sheffield Police contacted one of the men whose identification was found in Berlinger's car. The man said that he had been robbed in Solon the previous week. The

evidence was turned over to Det. Faranda, who considered Berlingeri and Arzola suspects in the robbery. Det. Faranda used the records from Berlingeri and Arzola's confiscated cell phones to identify Masters, Barnes, and defendant as additional suspects.

{¶ 39} On May 13, 2009, Det. Faranda interviewed Masters, who identified the other suspects involved in the robbery, including defendant, which was consistent with what Det. Faranda discovered through the cell phone records. Det. Faranda found items belonging to some of the players in Masters' garbage can, including a driver's license, a social security card, and multiple credit cards. The police also recovered a temporary vehicle tag with duct tape stuck to it. The tag was reported stolen from a car in Warrensville Heights on the same day as the robbery. Subsequent testing showed Berlingeri's fingerprints on the tag.

{¶ 40} A custodian of records from defendant's cell phone provider testified that cell phone records show the time each call was made or received, as well as the location of the tower or cell site through which each call was transmitted. Using this information, defendant's location could be determined, within a two-mile radius, any time his cell phone was in use.

{¶ 41} The cell phone records from Masters, Barnes, Berlingeri, one of the Arzola brothers, and defendant showed that they were in almost constant contact with each other shortly before and after the robbery. The records additionally showed that the calls from all five cell phones were transmitted through towers located in a clear path from Tremont to

Solon, then back to Tremont, between approximately 10:00 p.m. on April 17, 2009 and 12:30 a.m. on April 18, 2009.

{¶ 42} By 10:00 p.m. on the night of the robbery, the five co-defendants' calls were transmitted from the Tremont area, which is where Masters' apartment is. Just before 10:30 p.m., their location started moving east. By 11:00 p.m., Berlingeri and defendant's calls were being transmitted through a tower in Warrensville Heights, near where the temporary tags were reported stolen.[2] By 11:15 p.m., calls from all five phones were being transmitted through towers located close to either the gas station meeting point or the building where the robbery took place. Starting at approximately 11:50 p.m., the co-defendants headed north, then west, which corresponded with Det. Faranda's suspected escape route. By 12:30 a.m. on April 18, 2009, the records put the co-defendants back in the Tremont area.

{¶ 43} In particular to defendant, the phone records showed that on April 17, 2009, defendant called Masters around noon and again at 7:35 p.m. Defendant received a call from Masters at 7:47 p.m. Defendant called Barnes at 8:38 p.m. Fourteen phone calls took place between defendant and Masters from 10:26 p.m. to 12:18 a.m. on April 18, 2009. Barnes called defendant at 11:49 p.m. and defendant called Barnes at 11:57 and 11:58 p.m. on April 17, 2009.

---

[2]The state's theory was that Berlingeri and defendant were assigned the task of getting a temporary tag to use on the unidentified driver's vehicle during the robbery.

{¶ 44} Furthermore, according to the cell tower locations from defendant's phone records, he was in Tremont at 9:23 p.m. and began heading east by 10:26 p.m. Defendant was near where the temporary tags were stolen around 11:00 p.m. From 11:14 to 11:49 p.m. he was near the gas station and scene of the robbery, and by 11:55 p.m., he was heading north along interstate 271. By 12:22 a.m. on April 18, 2009, a call indicated defendant was back in the Tremont area. A 1:03 a.m. call indicated defendant was still in Tremont, and by 1:07 a.m., the call was being transmitted by a nearby tower in Cleveland.

{¶ 45} Additionally, on April 18, 2009, defendant placed a call to Barnes at 4:12 a.m., called Masters at 11:58 a.m., called Barnes at 1:34 p.m. and 2:28 p.m., and called Masters again at 4:38 p.m.

{¶ 46} On June 30, 2009, Det. Faranda interviewed defendant, who denied being involved in the robbery. Defendant's SUV was searched and police recovered a partially used roll of duct tape and one "bluish-purple" latex glove. Subsequent forensic testing showed that the duct tape from defendant's SUV and the duct tape found on the temporary tag in Masters' trash "may have originated from the same source."

{¶ 47} Defendant testified on his own behalf, and stated that, for the past year or two, he had been dealing cards at poker games, some of which Masters hosted. It was common for defendant to do other things for Masters, such as recruiting poker players, picking up food, or providing transportation for people. Masters frequently owed defendant money, and

oftentimes, getting paid from Masters was like "a game." According to defendant, it would not be unusual to drive a friend of Masters to a strip club to pick up money.

{¶ 48} On April 17, 2009, defendant was dealing cards at a poker game on the west side of Cleveland, when he received a text message from Masters indicating that Masters had cash for defendant. At the time, Masters owed defendant close to $800, and defendant took this to mean that Masters had the money. Defendant went to Masters' apartment. Masters told defendant they were going to the Crazy Horse to pick up the money and Berlingeri would ride with defendant. Defendant denied seeing any guns and denied hearing any conversation about a robbery.

{¶ 49} Defendant drove Berlingeri to the Crazy Horse, and both men talked on their cell phones during the ride. After arriving at the Crazy Horse, they waited for Masters and the others. Berlingeri had another conversation on his cell phone, then defendant and Berlingeri went "to the gas station to get something." Masters and the other co-defendants arrived at the gas station, and Berlingeri got into another car.

{¶ 50} Defendant called Masters because defendant was confused and "couldn't understand what was going on." Defendant's main purpose was to pick up his money. Defendant thought if he did not get the money from Masters at the time, the opportunity would be lost and he would have to wait to get paid. Defendant testified that the high volume of calls between him, Masters, and Barnes after everyone met at the gas station was to sort out

whether Masters got the money at the Crazy Horse, but that nothing was mentioned about a robbery.

{¶ 51} Eventually, defendant left the area without getting paid, and there is no testimony that anyone went inside the Crazy Horse.

{¶ 52} Defendant denied going back to Masters' apartment later that night and receiving "a cut of the money." Defendant testified that he got the money the following Monday, but he did not recall how much Masters gave him.

{¶ 53} Asked to explain why his cell phone records put him back in the Tremont area after the robbery, defendant testified that he returned to continue dealing the poker game on the west side of Cleveland, and he usually passes by Tremont on his way to this game. However, defendant later added that he had to pick up his friend downtown on the way back to the west side poker game.

{¶ 54} Defendant testified that he had duct tape in his car because he had used it on boxes when he moved, but he did not have an explanation for why a blue surgical glove was found in his vehicle.

{¶ 55} On cross-examination, defendant testified that he did not remember whether he went inside Masters' apartment on the night of April 17, 2009. "I might have went up and came down, but I know I was in a hurry. * * * I probably — I would have went up. But as soon as I got there, I probably went up or not. I'm not sure."

**{¶ 56}** Defendant testified that he knew Masters was driving himself and Barnes to the Crazy Horse, defendant was driving Berlingeri, and "the other car was going to be going there." Subsequently, defendant was asked if he "understood everybody would be going to the same location, three different vehicles, correct?" Defendant responded, "I didn't know. No, I didn't know that."

**{¶ 57}** To be found guilty of these crimes for aiding and abetting the principle offenders, defendant must have supported, assisted, encouraged, cooperated with, advised, or incited his co-defendants, and he must have shared their criminal intent. *State v. Johnson* (2001), 93 Ohio St.3d 240, 754 N.E.2d 796. "Such intent may be inferred from the circumstances surrounding the crime." Id. at 246. For example, "participation may be inferred from presence, companionship, and conduct before and after the offense is committed. Aiding and abetting may also be established by overt acts of assistance such as driving a getaway car or serving as a lookout." *State v. Lett*, Cuyahoga App. No. 84696, 2008-Ohio-1308, ¶29 (internal citations omitted).

**{¶ 58}** In looking at this evidence in a light most favorable to the prosecution, as we must, a reasonable trier of fact could have found sufficient evidence to convict defendant as an accomplice to the robbery and other associated offenses. Masters and Barnes testified that defendant was at Masters' apartment with the others when the plan was formulated. Defendant knew what was happening when he drove Berlingeri to the meeting place and

defendant agreed to act as a lookout. Defendant was paid $500 for his role in the robbery. Defendant admitted traveling with the offenders from Tremont to the Solon area immediately prior to the robbery. The cell phone records showed that defendant was in almost constant communication with Masters and Barnes before and after the robbery. The records also showed that defendant traveled back to Tremont after the robbery was committed.

{¶ 59} In finding defendant guilty of aiding and abetting the robbers, the court noted minor differences between Masters' and Barnes' testimony. However, the court stated that "these are attributable to each man trying to couch his testimony in a light most favorable to [himself]." The court opined that if Masters and Barnes had lied about defendant's participation in the robbery "to curry favor with the State to get a better deal, the defendant's participation is so minimal that bringing him into the mix with defendants would not significantly help them."

{¶ 60} The court did not find defendant's explanation of events to be credible. "[W]hile on break, [defendant] goes to Masters to get his money and then doesn't get it. Instead, he gets suckered into an aggravated robbery. He transports Berlingeri to the staging area. * * * [A]ll of this happens while he's still on break from the card game. * * * [H]e lingers in the area and returns to the west side of Cleveland by the longest route possible.

{¶ 61} "By the time he was back in the Cleveland area, the cell phone records indicate that he has been gone at least from the card game a minimum of two and a half hours. All

this, on what was anticipated to be a one-hour break, and he claims he never got money that night from Masters. He further testified that he did get money from Masters on the following Monday. So his errand from a — in leaving a paying job to collect monies owed him from a previous job was a total failure."

{¶ 62} Accordingly, we cannot say that the court lost its way in convicting defendant of these offenses as an accomplice. Defendant's first and second assignments of error are overruled and his convictions are affirmed.

Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


JAMES J. SWEENEY, JUDGE

MELODY J. STEWART, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR